# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2025 ND 120

Elizabeth Sanda,                                                    Plaintiff and Appellee

    v.

Derek Sanda,                                                    Defendant and Appellant

## No. 20240352

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Jackson J. Lofgren, Judge.

AFFIRMED.

Opinion of the Court by Jensen, Chief Justice.

Kelsey L. Hankey, Grand Forks, ND, for plaintiff and appellee; submitted on brief.

Laura C. Ringsak, Bismarck, ND, for defendant and appellant; submitted on brief.

**Jensen, Chief Justice.**

[¶1]   Derek Sanda appeals from a district court's "partial judgment" and judgment. He argues the court erred in several respects in its division of marital property. We affirm.

I

[¶2]   The historical facts are largely not in dispute, and disputes are noted within the opinion. In the fall of 2014, Derek Sanda and Elizabeth Sanda began dating. The two moved in together after Elizabeth Sanda purchased a home in January 2015. In 2016 they married and opened a joint bank account. Elizabeth Sanda brought one child into the marriage, whom Derek Sanda later adopted, and Derek Sanda brought two children into the marriage. They had one child together.

[¶3]   Derek Sanda and Elizabeth Sanda executed a premarital agreement. The premarital agreement protected Elizabeth Sanda's trusts containing the Leo Klein a/k/a Leo Klein Jr. Family Assets and the future inheritance of the Vern Vetter Assets. The premarital agreement states:

> Elizabeth [Sanda] shall have, keep, and maintain sole ownership, control, and enjoyment of, and shall have the exclusive right to dispose of, by any means, during her lifetime including by testamentary disposition, the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets*, including additional principal, interest, or other assets earned or received hereafter as a result of such property, as her absolute property, without interference by or from the other, in the same manner as if the marriage had not taken place. This provision shall apply to all of the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets*.
>
> The parties intend and desire that the property described as the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets* (real and personal or mixed) owned by Elizabeth [Sanda] at the time of their marriage, or at any time hereinafter acquired by Elizabeth

[Sanda], shall be [Elizabeth Sanda's] separate property, and shall remain her respective separate property in the event of divorce.

The parties agree that Elizabeth [Sanda] shall manage and control her separate property, the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets*; any indebtedness incurred by her with respect to her own separate property holdings shall be her own individual and sole responsibility and shall not bind or affect Derek [Sanda]; and the costs of management, development, maintenance, and preservation of the separate property holdings of Elizabeth [Sanda] (the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets*) shall be the individual and sole responsibility of Elizabeth [Sanda], and shall not be the obligation of Derek [Sanda].

Derek [Sanda] will not contribute funds, cash, property, services, or efforts to the acquisition or improvement of [Elizabeth Sanda's] separate property, the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets*. However, if Derek [Sanda] should make any such contribution to the separate property of Elizabeth [Sanda], the contribution will be deemed a gift and Derek [Sanda] will have no claim against or interest in the separate property of Elizabeth [Sanda] by reason of such contribution, in the event of divorce.

Any income, interest, dividends, rents, or other revenue and profits attributable to the personal services, skill, and efforts of Elizabeth [Sanda] in managing her separate property, the *Leo Klein a/k/a Leo Klein Jr. Family Assets* and the *Vern Vetter Assets*, shall also be her separate property and shall remain her respective separate property in the event of divorce.

After the marriage of Derek [Sanda] and Elizabeth [Sanda], they may, but shall not be required to, establish a joint account in which they shall contribute monies to be used for the payment of such items as they shall mutually agree. Said account, if established, shall be maintained by both parties and either party shall be entitled to write checks on this account.

This *Premarital Agreement* will not apply to property currently owned by Derek [Sanda] and Elizabeth [Sanda], as described on Exhibit A and Exhibit B. This *Premarital Agreement* applies to the *Leo Klein a/k/a Leo Klein Jr. Family Assets*, and any revenue, profits, etc. derived from the same, as noted above. This *Premarital Agreement*

will not apply to property that the parties separately or jointly acquire in the future, other than the *Vern Vetter Assets*, and any revenue, profits, etc. derived from the same, as noted above. The *Leo Klein a/k/a Leo Klein Jr. Family Assets*, and any revenue, profits, income, increase in said accounts etc. derived from the same, and the *Vern Vetter Assets*, and any revenue, profits, income, increase in said accounts, etc. derived from the same, will be kept and maintained as separate accounts and shall remain the sole and separate property of Elizabeth [Sanda].

[¶4] Elizabeth Sanda entered the marriage with a net worth of approximately $1.6 million consisting of $1.3 million in investments, $211,000 in home equity, and $121,000 in interest in family partnerships. Derek Sanda entered the marriage with a negative net worth, having $580 in his bank account and approximately $15,000 in debt.

[¶5] Elizabeth Sanda provided an $80,000 down payment when she purchased her home in January 2015. Derek Sanda did not contribute to the mortgage payments on the home Elizabeth Sanda purchased prior to the marriage. In 2017, the parties jointly purchased a second home with both names appearing on the deed and mortgage documentation. However, only Elizabeth Sanda signed the $250,000 promissory note and she contributed $352,000 from her inheritance as the down payment. Derek Sanda made no financial contribution toward the purchase and voiced concerns about whether they could afford the property. Elizabeth Sanda paid the approximately $1,800 monthly mortgage payments using funds from her inheritance.

[¶6] Although Derek Sanda did not contribute towards the mortgage payments, he made renovations on the house. He replaced the flooring, trim, handrails, posts, stairs, and doors. He removed the wallpaper and a load-bearing wall, painted the walls, added lights, modified the fireplace, built a place for the TV, and renovated the garage and shop. The proceeds from the sale of the home Elizabeth Sanda purchased before the marriage funded the renovations to the second home.

[¶7] Elizabeth Sanda had been working as a licensed cosmetologist since 2008 and later opened her own salon where she rented out booth space. Between 2018

3

and 2022, she transitioned to being a stay-at-home mother and operated a small online boutique; participated in LimeLife; and used some of her inheritance to invest in The Paddle Trap, a restaurant and bar. During this same period of time, Derek Sanda worked as a carpenter through his own carpentry business and performed various construction projects for The Paddle Trap from 2019 to 2021. Derek Sanda's earnings were deposited into either the joint marital account or his business account. Elizabeth Sanda used funds from her inheritance to fund Derek Sanda's business operations, covering the purchase of tools, equipment, and a 2019 GMC Sierra. With regard to the 2019 GMC Sierra, Elizabeth Sanda provided a $20,000 down payment and subsequently paid off the entire loan using funds from her inheritance.

[¶8] During their marriage, the amount of income differed between the parties. In 2017 to 2019, Elizabeth Sanda's income was greater than Derek Sanda's income. In 2020 to 2022, Derek Sanda's income was greater than Elizabeth Sanda's income, at least in part because of her investment in The Paddle Trap and employing Derek Sanda to provide work for The Paddle Trap.

[¶9] Elizabeth Sanda regularly transferred $3,000-$5,000 from her inheritance to the joint account. She also used those funds to help pay Derek Sanda's $1,100 monthly child support obligations. When employed, Derek Sanda made his child support payments, but the payments often came from his business account, which was funded by Elizabeth Sanda's inheritance. By spring 2023, Elizabeth Sanda's inheritance had been reduced to a balance of approximately $340,000.

[¶10] In December 2023, Elizabeth Sanda filed for divorce. An interim order hearing was held in January 2024 and an interim order was issued in February 2024. The interim order awarded Elizabeth Sanda exclusive use of the marital home and her 2019 Honda Odyssey during the pendency of the divorce. Derek Sanda was awarded exclusive use of his 2019 GMC Sierra during the pendency of the divorce. The interim order required each party to pay their respective vehicle insurance payments and licensing, and contained a provision prohibiting the parties from dissipating assets.

4

[¶11] During the July 2024 trial, Elizabeth Sanda argued that Derek Sanda traded his 2019 GMC Sierra for a 2024 Toyota Camry without her consent during the interim period. Elizabeth Sanda claimed she believed the documents she signed to be refinancing papers that would remove her from the truck loan, as mandated by the interim order, which had made Derek Sanda exclusively responsible for the vehicle payments. The 2019 GMC Sierra loan was satisfied on March 27, 2024, with the vehicle trade occurring two days later on March 29, 2024—the established valuation date for the marital estate. *See* N.D.C.C. § 14-05-24(1). Elizabeth Sanda maintained that Derek Sanda improperly dissipated marital property by starting the trade before the valuation date.

[¶12] The parties disputed the inclusion within the marital debt of a loan that Derek Sanda received to cover his legal fees. Elizabeth Sanda opposed including the loan as a marital debt because the loan documentation referenced "pay attorney," and their premarital agreement stipulated that each spouse would be responsible for their own legal expenses. Derek Sanda contended the loan should be considered marital debt since Elizabeth Sanda had transferred $7,500 from her individual account to pay her attorney's fees in November.

[¶13] Elizabeth Sanda requested reimbursement for vehicle insurance premiums she paid covering Derek Sanda's daughter's car, Derek Sanda's Dodge Ram, Derek Sanda's Toyota Camry, and his tool trailer. Rather than dividing insurance expenses equally as provided by the interim order, Elizabeth Sanda invoiced Derek Sanda for insurance on several vehicles, including one no longer in their possession. She also charged Derek Sanda for insurance on the 2024 Toyota Camry while simultaneously arguing the district court should classify the 2019 GMC Sierra, not the Camry, as marital property.

[¶14] Following the sale of her ownership stake in The Paddle Trap, Elizabeth Sanda received $46,000, which she initially deposited into the joint account before establishing her individual account. She subsequently withdrew $17,874 to cover bills and attorney's fees. Derek Sanda argued the funds deposited into the marital account were marital property.

[¶15] The district court entered what it referenced as a "partial judgment"[1] in September 2024 and judgment in October 2024. The marital home was valued at $665,900 and awarded to Elizabeth Sanda subject to the existing mortgage. The 2019 Honda Odyssey was valued at $25,459 and awarded to Elizabeth Sanda. The court determined Derek Sanda was solely liable for the loan used to pay his attorney's fees because Elizabeth Sanda's $7,500 attorney payment came from her personal accounts, which were protected under the premarital agreement, and he remained responsible for his own legal fees under the terms of the premarital agreement.

[¶16] The 2019 GMC Sierra was traded on March 29, 2024, precisely sixty days prior to the original trial date of May 28, 2024. The district court found that Derek Sanda should have obtained court approval before disposing of the 2019 GMC Sierra, because the interim order precluded the parties from dissipating marital assets. Consequently, the court found that the 2019 GMC Sierra, rather than the 2024 Toyota Camry, would be treated as marital property. The 2019 GMC Sierra was appraised at $42,695 with an outstanding loan balance of $12,636.64, and awarded to Derek Sanda.

[¶17] After valuation of the marital property, the district court explained its rationale for the marital property division:

> The issue that permeates the marital estate is [Elizabeth Sanda's] inheritance and how it was used during the marriage. Prior to the marriage Elizabeth [Sanda] received a substantial inheritance due to the passing of her mother. [Elizabeth Sanda's] financial advisor, Michael J.B. Schaaf, testified prior to the marriage she had a net worth of approximately $1.6 million. She owned her own home. Mr. Schaaf characterized Elizabeth [Sanda] as a good steward of her inheritance before the marriage. The parties signed a

---

[1] The district court used the term "partial judgment." However, we note the court did not direct the entry of a final judgment with respect to any of the claims and the use of the term "partial judgment" in this opinion reflects the language used by the court and is not recognition that the document was properly referenced as a "partial judgment." *See Morales v. Weatherford U.S.*, 2024 ND 81, ¶¶ 11-33, 6 N.W.3d 657; *Buchholz v. Barnes Cnty. Water Bd.*, 2008 ND 158, ¶ 7, 755 N.W.2d 472.

6

*Premarital Agreement* to exclude [Elizabeth Sanda's] inheritance from distribution should the parties divorce.

Derek [Sanda] entered the marriage with no financially meaningful assets. Elizabeth [Sanda] testified that when they married [Derek Sanda's] credit was not good and he had a child support arrearage of approximately $4,000.00. He had additional debt of approximately $14,000.00. . . . Elizabeth [Sanda] testified Derek [Sanda] lived with his mother prior to moving into her home.

Elizabeth [Sanda] began withdrawing money from her inheritance after the parties married. She used $352,000.00 from her investments to make a down payment on the marital home. Mr. Schaaf testified Elizabeth [Sanda] had begun making systematic monthly withdrawals to cover the mortgage on the marital home and [Derek Sanda's] child support obligations for his other children. Mr. Schaaf became concerned with the depletion of [Elizabeth Sanda's] inheritance and met with Elizabeth and Derek [Sanda] in the spring of 2023. They discussed Derek [Sanda] finding alternative employment. Mr. Schaaf testified Elizabeth [Sanda] had used her inheritance to pay for the tools and work truck for [Derek Sanda's] carpentry business. Mr. Schaaf testified [Derek Sanda's] business was not sustainable and only made $15,000.00[] to $20,000.00 per year excluding the times he was being paid by [T]he Paddle Trap, a bar and restaurant partially owned by Elizabeth [Sanda]. According to Mr. Schaaf, Elizabeth [Sanda] had depleted her assets to around $340,000.00 not including equity in the marital home.

Mr. Schaaf acknowledged Elizabeth and Derek [Sanda] lived outside their means. They purchased the marital home for $585,000.00 despite having modest income. . . . During a substantial portion of the marriage Elizabeth [Sanda] was a stay-at-home mother. She operated several small business ventures that were not exceedingly profitable. Any appreciable income Elizabeth [Sanda] reported during the marriage was associated with her protected inheritance. [Derek Sanda's] carpentry business was not overly successful. The only timeframe Derek [Sanda] earned significant income was when he was doing work for [T]he Paddle Trap that Elizabeth [Sanda] partially owned.

[¶18] The district court awarded Derek Sanda a net value of $26,635.64 and Elizabeth Sanda a net value of $463,699. The court found that the couple

maintained a lifestyle beyond their financial means, relying on Elizabeth Sanda's inheritance to cover their mortgage payments, daily living expenses, tools and equipment for Derek Sanda's carpentry business, his vehicle, and his child support obligations. The parties' bank accounts were consistently funded through Elizabeth Sanda's inheritance. The court further found that despite the protection afforded by the premarital agreement, Elizabeth Sanda voluntarily depleted her inheritance to support their standard of living.

[¶19] The district court found the parties' marriage to be a long-term marriage, noting the parties' nine-and-a-half-year relationship. The court found Derek Sanda had contributed to the marriage through home renovations and business operations that generated income. To achieve an equitable division of marital assets, the court ordered Elizabeth Sanda to pay Derek Sanda an additional sum of $50,000. Derek Sanda was required to reimburse Elizabeth Sanda for expenses she incurred under the interim order. The court made no adjustments regarding the funds from the sale of The Paddle Trap first placed into the joint account, transferred to Elizabeth Sanda's personal account, and the subsequent $17,874.60 withdrawal from Elizabeth Sanda's account.

II

[¶20] This Court's standard of review for property distributions is well-established:

> This Court will not reverse the district court's decision related to property distribution unless the findings are clearly erroneous. A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if there is no evidence to support a finding, or if, although there is some evidence to support it, on the entire evidence, we are left with a firm conviction a mistake has been made. This Court views the evidence in the light most favorable to the findings, and the district court's findings of fact are presumptively correct. A district court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and this Court will not reverse simply because it may have viewed the evidence differently. On appeal, we do not reweigh conflicts in the evidence, and we give due regard to the trial court's opportunity to judge the credibility of the witnesses.

8

*Ceynar v. Ceynar*, 2025 ND 53, ¶ 3, 18 N.W.3d 613 (citing *Swanson v. Swanson*, 2019 ND 25, ¶ 5, 921 N.W.2d 666).

III

[¶21] Derek Sanda argues the district court erred in its marital property division because the court: (1) failed to provide "specific findings linking the parties' conduct to the significant asset disparity[,]" (2) failed to consider the funds Elizabeth Sanda transferred from her inheritance to the joint account to be marital property, (3) failed to find "any economic waste or misconduct when Elizabeth [Sanda] had no explanation for withdrawing over $17,000 from an account that was funded through the joint account[,]" (4) wrongfully valued the 2019 GMC Sierra as marital property, (5) failed to include either Derek Sanda's loan for attorney's fees in the asset and debt listing or Elizabeth Sanda's attorney's fees as part of the marital estate, and (6) "ordered reimbursement for expenses Elizabeth [Sanda] paid, as outlined by her Exhibit 30, despite her admitting that Exhibit 30 is incorrect."

[¶22] Section 14-05-24(1), N.D.C.C., governs the division of marital property:

> When a divorce is granted, the court shall make an equitable distribution of the property and debts of the parties. Except as may be required by federal law for specific property, the valuation date for marital property and debt is the date mutually agreed upon between the parties. If the parties do not mutually agree upon a valuation date, the valuation date for marital property and debt is sixty days before the initially scheduled trial date. If there is a substantial change in value of an asset or debt between the date of valuation and the date of trial, the court may adjust the valuation of that asset or debt as necessary to effect an equitable distribution and shall make specific findings that another date of valuation is fair and equitable.

"All property held by the parties, whether it is held individually or jointly, is deemed marital property, and the court must determine the property's total value before making an equitable distribution." *Feist v. Feist*, 2015 ND 98, ¶ 6, 862 N.W.2d 817. "Separate property, even if it is inherited, must initially be

9

included in the marital estate, but the property's origin may be considered when equitably dividing the estate." *Id*.

[¶23] The value a district court places on marital property depends on the evidence presented by the parties. *Fox v. Fox*, 2001 ND 88, ¶ 22, 626 N.W.2d 660. "A trial court may accept the valuations submitted by one party, or weigh one party's value testimony more heavily." *Peterson v. Peterson*, 1999 ND 191, ¶ 14, 600 N.W.2d 851. "A choice between two permissible views of the evidence is not clearly erroneous when the trial court's findings are based either on physical or documentary evidence, or inferences from other facts, or on credibility determinations." *Hitz v. Hitz*, 2008 ND 58, ¶ 13, 746 N.W.2d 732 (quoting *Fox*, ¶ 14).

[¶24] After the district court values the property, the court must then equitably divide the entire marital estate under the *Ruff–Fischer* guidelines, which requires the court to consider the following factors:

> The respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material. The trial court is not required to make specific findings, but it must specify a rationale for its determination.

*Ulsaker v. White*, 2006 ND 133, ¶ 10, 717 N.W.2d 567 (quoting *Horner v. Horner*, 2004 ND 165, ¶ 9, 686 N.W.2d 131). "There is no set formula or method for dividing the marital estate; instead, the division is based on each case's particular circumstances." *Feist*, 2015 ND 98, ¶ 6.

A

[¶25] Derek Sanda argues the district court erred in its marital property division because it failed to provide "specific findings linking the parties' conduct to the significant asset disparity."

10

[¶26] A "property distribution does not need to be equal to be equitable, but the court must explain a substantial disparity." *Wald v. Wald*, 2020 ND 174, ¶ 19, 947 N.W.2d 359. "[A] district court must adequately explain the evidentiary and legal basis for its decision, allowing the parties and this Court to understand the decision." *Rath v. Rath*, 2018 ND 98, ¶ 7, 909 N.W.2d 666 (quoting *Curtiss v. Curtiss*, 2016 ND 197, ¶ 13, 886 N.W.2d 565). "The [district] court's findings are sufficient if they afford a clear understanding of the court's decision and assist this Court in conducting its review." *Id.* (quoting *Harvey v. Harvey,* 2016 ND 251, ¶ 4, 888 N.W.2d 543). Furthermore, although "a long-term marriage supports an equal division of all marital assets[,]" the "duration of a marriage is only one factor of the *Ruff-Fischer* guidelines and is not controlling in a distribution of marital property." *Schultz v. Schultz*, 2018 ND 259, ¶ 10, 920 N.W.2d 483.

[¶27] The district court explained the asset disparity in its analysis of the *Ruff-Fischer* factors:

> Elizabeth [Sanda] entered the marriage with a net worth of approximately $1.6 million compared to Derek [Sanda] who entered the marriage with no financially significant assets and was over $14,000.00 in debt. . . . The largest asset in the marital estate is the marital residence. Elizabeth [Sanda] withdrew $352,000.00 from her inheritance to make the down payment. Throughout the marriage Derek [Sanda] greatly benefited from [Elizabeth Sanda's] protected inheritance as it paid for their home, his child support obligations to his other children, the tools and vehicle for his business, as well as many other expenses. Derek [Sanda] did little during the marriage to increase the value of the marital estate. Elizabeth [Sanda] should receive a larger share of the marital estate.

> However, the parties were together for approximately nine and a half years and two children were born during their relationship. This was not a short-term marriage. Derek [Sanda] worked on the marital home and operated a business that did provide some income. A disproportion of $437,063.36 in the distribution of the marital estate is not equitable. Considering the significant disparity in assets owned by the parties at the commencement of the marriage, [Elizabeth Sanda's] down payment of $352,000.00 towards the most significant marital asset, and the

11

conduct of the parties during the marriage, the Court finds Elizabeth [Sanda] should make a payment to Derek [Sanda] in the amount of $50,000.00 which will result in an equitable distribution of the marital estate.

[¶28] We conclude the district court's findings are not clearly erroneous because the court referenced or "link[ed]" the parties' financial conduct and property origin to explain the asset disparity. *See Feist*, 2015 ND 98, ¶ 6 ("[T]he property's origin may be considered when equitably dividing the estate.").

B

[¶29] Derek Sanda argues the district court erred in its marital property division because it failed to recognize that "any funds Elizabeth [Sanda] transferred from her protected property to a joint account or jointly titled property are considered marital property[.]"

[¶30] In the partial judgment, the district court placed an emphasis on the property's origin when equitably dividing the estate:

> The parties' bank accounts reflect money moving back and forth between their bank accounts with the originating source almost always being [Elizabeth Sanda's] protected inheritance.
>     . . . .
>     Elizabeth [Sanda] entered the marriage with a net worth of approximately $1.6 million compared to Derek [Sanda] who entered the marriage with no financially significant assets and was over $14,000.00 in debt. . . . The largest asset in the marital estate is the marital residence. Elizabeth [Sanda] withdrew $352,000.00 from her inheritance to make the down payment. Throughout the marriage Derek [Sanda] greatly benefited from [Elizabeth Sanda's] protected inheritance as it paid for their home, his child support obligations to his other children, the tools and vehicle for his business, as well as many other expenses. Derek [Sanda] did little during the marriage to increase the value of the marital estate. Elizabeth [Sanda] should receive a larger share of the marital estate.

12

*See Feist*, 2015 ND 98, ¶ 6. ("Separate property, even if it is inherited, must initially be included in the marital estate, but the property's origin may be considered when equitably dividing the estate.").

[¶31] We conclude the district court was not clearly erroneous in determining which funds constituted marital property. While the court emphasized the property's origin when making an equitable division of assets, it considered the property in making the division.

C

[¶32] Derek Sanda argues the district court erred in its marital property division because it "failed to find any economic waste or misconduct when Elizabeth [Sanda] had no explanation for withdrawing over $17,000 from an account that was funded through the joint account."

[¶33] In *Kitzan v. Kitzan*, this Court explained:

> Economic fault and dissipation of assets are relevant factors the court may consider and are grounds for an unequal distribution. Economic misconduct is misconduct that results in a wasted asset or in the reduction of the net marital estate. A court's finding of economic or non-economic fault is a finding of fact subject to the clearly erroneous rule.

2023 ND 23, ¶ 14, 985 N.W.2d 717 (cleaned up).

[¶34] In the partial judgment, the district court considered the economic misconduct of both parties:

> Elizabeth [Sanda] blames Derek [Sanda] for the depletion of her inheritance but they are both responsible. They lived beyond what their incomes could support and used [Elizabeth Sanda's] inheritance to sustain their lifestyle. It paid for their mortgage, their daily expenses, the tools for [Derek Sanda's] business and his vehicle, and [Derek Sanda's] child support. The parties' bank accounts reflect money moving back and forth between their bank accounts with the originating source almost always being [Elizabeth Sanda's] protected inheritance.

13

. . . Her protected assets could have remained invested had she and Derek [Sanda] been financially responsible. It appears very little attention or concern was given to their finances. For example, Elizabeth [Sanda] could not recall why $17,000.00 was withdrawn from her checking account in January 2024.

[¶35] We conclude the district court was not clearly erroneous in considering the economic misconduct of both parties, including Elizabeth Sanda's $17,000 withdrawal.

D

[¶36] Derek Sanda argues the district court erred in dividing marital property by applying an improper valuation date and by treating the 2019 GMC Sierra, rather than the 2024 Toyota Camry, as marital property.

[¶37] Section 14-05-24(1), N.D.C.C., governs the valuation of marital property:

If the parties do not mutually agree upon a valuation date, the valuation date for marital property and debt is sixty days before the initially scheduled trial date. If there is a substantial change in value of an asset or debt between the date of valuation and the date of trial, the court may adjust the valuation of that asset or debt as necessary to effect an equitable distribution and shall make specific findings that another date of valuation is fair and equitable.

[¶38] Here, the trial was initially scheduled for May 28, 2024. The 2019 GMC Sierra loan was satisfied on March 27, 2024, with the vehicle trade occurring two days later on March 29, 2024. The district court found March 29, 2024 to be the valuation date because it was exactly sixty days before the initially scheduled trial date.

[¶39] However, the district court continued to explain that Derek Sanda was prohibited from dissipating marital assets and should have obtained court approval before disposing of the 2019 GMC Sierra. The court observed that documentation showed a trade-in allowance of $35,000 for the 2019 GMC Sierra, while the loan was satisfied for approximately $30,000 on March 27, 2024. The

14

court found this discrepancy suspicious, noting: "Elizabeth [Sanda] used her protected accounts to make a down payment of $20,000.00 on the vehicle less than a year before the trade. Where did the equity go? There was no testimony provided that the vehicle was damaged or faulty." Relying on those factual findings, the court determined that the 2019 GMC Sierra would be classified as marital property and valued as of March 29, 2024.

[¶40] We conclude the district court was not clearly erroneous in determining the valuation date or in treating the 2019 GMC Sierra, rather than the 2024 Toyota Camry, as marital property. There was a "substantial change in value of an asset . . . between the date of valuation and the date of trial," which permits the court to modify the valuation date to ensure fairness. *See* N.D.C.C. § 14-05-24(1).

E

[¶41] Derek Sanda argues the district court erred when it failed to include either his attorney's fees loan in the asset and debt listing or Elizabeth Sanda's attorney's fees in the marital estate.

[¶42] The premarital agreement required each party to be responsible for their own attorney's fees. Derek Sanda obtained the Hometown Credit Union loan to pay for his attorney's fees. Elizabeth Sanda transferred $7,500 from her First Community Credit Union account, which was included on the asset and debt listing, to pay her attorney's fees. In the partial judgment, the district court explained:

> The Court understands [Derek Sanda's] argument that Elizabeth [Sanda's] attorney's fees are accounted for as a reduced amount in her FCCU account. However, Elizabeth [Sanda] testified the funds she used to pay for her attorney came from her accounts that are protected by the *Premarital Agreement*. These funds were placed into her FCCU account and remitted to her attorney. There is no evidence the funds would have been in the FCCU account "but for" Elizabeth [Sanda] transferring them into the account to pay her attorney. The Court finds Derek [Sanda] shall be solely responsible for the Hometown Credit Union loan and will not include the loan debt in the equitable distribution of the marital estate.

[¶43] We conclude the district court was not clearly erroneous when it did not include Derek Sanda's loan or Elizabeth Sanda's attorney's fees in the marital estate because each party was responsible for their own attorney's fees under the premarital agreement.

F

[¶44] Derek Sanda also argues the district court erred "when it ordered reimbursement for expenses Elizabeth [Sanda] paid, as outlined by her Exhibit 30, despite her admitting that Exhibit 30 is incorrect."

[¶45] The interim order required the parties to be equally responsible for the vehicle insurance payments. Elizabeth Sanda billed Derek Sanda for more than half of the insurance costs. However, Elizabeth Sanda was paying the vehicle insurance for Derek Sanda's daughter's vehicle—a vehicle not included within the asset and debt listing, Derek Sanda's Dodge Ram that he no longer owned, Derek Sanda's Toyota Camry, and his tool trailer. The district court found Elizabeth Sanda's request for reimbursement to be credible and Derek Sanda was to reimburse her. Furthermore, while Elizabeth Sanda had initially acknowledged that Exhibit 30 was incorrect, she subsequently testified at trial that Exhibit 30 was actually accurate.

[¶46] We conclude the district court was not clearly erroneous "when it ordered reimbursement for expenses Elizabeth [Sanda] paid[.]" *See Ceynar*, 2025 ND 53, ¶ 3 ("On appeal, we do not reweigh conflicts in the evidence, and we give due regard to the trial court's opportunity to judge the credibility of the witnesses." (quoting *Swanson*, 2019 ND 25, ¶ 5)).

IV

[¶47] The district court did not err in its division of marital property. We affirm the judgment.

[¶48]  Jon J. Jensen, C.J.
       Daniel J. Crothers
       Lisa Fair McEvers

16

Jerod E. Tufte

Douglas A. Bahr